**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **THOMAS C. RIDLEY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **CASE NO. 6:08-cv-749-JA-GJK** |
| ) | |
| **SEARS HOME IMPROVEMENT** ) | |
| **PRODUCTS, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## JOINT PRETRIAL STATEMENT

Plaintiff, THOMAS C. RIDLEY ("Plaintiff" or "Ridley"), and Defendant, SEARS HOME IMPROVEMENT PRODUCTS, INC. ("Defendant" or "SHIP"), by and through their respective undersigned counsel, pursuant to the Court's September 16, 2008 Case Management and Scheduling Order and Local Rule 3.06, hereby submit their Joint Pretrial Statement, and state as follows:

## I.      BASIS OF FEDERAL JURISDICTION

This Court had jurisdiction over the parties and Plaintiff's federal claims pursuant to 29 U.S.C. § 1331.

## II.      STATEMENT OF NATURE OF ACTION

Plaintiff claims that SHIP discriminated against him based on his race, African-American, subjected him to sexual harassment, and retaliated against him based on

protected opposition to race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII")[1].   SHIP denies that Plaintiff was subjected to race discrimination, sexual harassment, or retaliation and contends that all of its actions related to Plaintiff's employment were for legitimate, non-discriminatory and non-retaliatory reasons. Plaintiff asserts that Defendant's proffered reasons for its actions were a pretext for retaliation, which Defendant denies.   Plaintiff claims damages for the alleged discrimination and retaliation.

III.     **FACTUAL STATEMENT OF EACH PARTY'S CASE**

A.  Plaintiff's Statement of the Case:

The Plaintiff, Thomas C. Ridley, has asserted a claim for race discrimination based on dissimilar treatment regarding the sales leads between himself and non-minority counterparts, retaliation, constructive discharge, and sexual harassment.

Thomas C. Ridley was provided with significantly more leads to lower income and lower household homes than other non-African American sales personnel.  It was recognized by management that some neighborhoods have much less chance of success in a sale as compared to others.  There is evidence that Thomas C. Ridley's supervisor, Lowelll Merklin, stated he took actions to hurt performance or earnings of Thomas C. Ridley and another black sales representative.

In addition to the sales data and the statements attributable to the supervisor, there is also evidence of a discriminatory animus by the supervisor who submitted e-mails of

---

[1] Plaintiff's Amended Complaint and Demand for Jury Trial (Doc. 13) also contained a claim of religious discrimination under Title VII, which was dismissed, on Plaintiff's motion, on August 20, 2009 (Doc. 33).

a derogatory nature, against blacks, Mexican immigrants and other minorities.  Further, the Plaintiff's supervisor told him that he would not know how to act in certain areas, an inference of racial bias since there was never an issue of behavior by Mr. Ridley in dealing with customers.

Thomas C. Ridley also intends to show a deviation from the policy and practice of the distribution of prime leads based on race.  For example, if the Defendant awarded success and best attitude to leads as they claim then the Plaintiff, the sales representative of the month in the Orlando office in January 2006, would have been rewarded in February 2006.  In that month another individual, a Caucasian, had significantly more prime leads than the Plaintiff, 14 to 9.  In some affluent areas Mr. Ridley received zero leads or just one lead compared co-workers who received substantially more leads.

The Plaintiff will establish that on May 17, 2006 the Plaintiff's immediate supervisor signed an affidavit as part of the position statement of Defendant in response to Plaintiff's complaint for discrimination.  Only five days after providing the affidavit a Performance Plan for Improvement was prepared and submitted to Thomas C. Ridley which cited issues which had occurred on January 21, 2006, four months after the supposed violation of company policy.  Thomas C. Ridley was threatened with termination.  Further, the Performance Plan for Improvement is part of a progressive steps disciplinary process of Defendant which Defendant deviated from.  The Plaintiff will further show that there is a history of retaliation even with other managers when complaints were made against Plaintiff's supervisor.

The Plaintiff will further show that the combination of the discriminatory actions against Thomas C. Ridley coupled with the retaliatory actions regarding Thomas C. Ridley caused an environment a reasonable person would find to be conditions under which were intolerable and therefore, his resignation was a constructive discharge.

Plaintiff also claims sexual harassment.  The Plaintiff will show that his supervisor engaged female subordinates in nudity, partial nudity and sex acts and photographed these events.  In turn, the supervisor displayed these items to the Plaintiff in the workplace and boasted of his sexual prowess compared to black men.  Plaintiff's supervisor's perverse exploitations of his sexual escapades of female subordinates and female co-workers of Mr. Ridley was significantly severe and pervasive to constitute sexual harassment.

B.  Defendant's Statement of the Case

SHIP is a retailer of home improvement products and services.  Plaintiff began his employment with SHIP on May 16, 2005, when he was hired as a Project Consultant in the Kitchen Department of SHIP's Orlando office.  As a Project Consultant, Plaintiff was assigned pre-set sales appointments and was responsible for making in-home sales presentations to consumers during the scheduled appointment time frames to sell SHIP's kitchen remodeling and cabinet re-facing products.  Plaintiff, like all Project Consultants, was compensated solely on a commission basis based on products sold.  During the relevant time of Plaintiff's employment, he reported to District Sales Manager Lowell Merklin.  Merklin reported directly to Metro Sales Manager Jim Poole.

SHIP provided Plaintiff with extensive information regarding its policies against discrimination and retaliation, including reporting procedures. At the time of his hire, Plaintiff received a copy of SHIP's employee handbook, which contained the Company's Equal Employment Opportunity Policy ("EEO Policy"). Among other things, SHIP's EEO Policy strictly prohibits discrimination against an applicant, associate, vendor, contractor or customer on the basis of race, and provides zero tolerance for retaliation against an individual who in good faith reports a perceived violation of the policy. The EEO Policy identifies persons to whom employees may complain of perceived discrimination, including their immediate supervisor or manager, their manager's manager or human resources, and also provides a toll-free phone number to report complaints of discrimination. During Plaintiff's employment, information pertaining to the EEOC policy and complaint procedures was available to employees on the Company's intranet website, as well as on a phone roster in the office where Plaintiff worked. Moreover, Plaintiff attended a day long training course addressing the EEO Policy in 2006.

Pursuant to SHIP's Standard Operating Procedures Manual ("SOP Manual"), sales leads are assigned to Project Consultants based on the quality of the lead. There are three types of leads – prime leads (both homeowners are present), plus leads (one decision maker is present or the lead is for a non-primary residence), and special projects (insurance repairs or lead with a customer who previously did not purchase a product after a sales presentation was made). Prime leads are considered the highest quality sales leads because the presence of both decision makers during the sales call increases the likelihood that a sale will be closed that day. The SOP Manual dictates that sales leads be distributed to Project

Consultants based on prior sales performance and positive attitude. Project Consultants are required to maintain a net closing percentage at or above a specified target level.

As the District Sales Manager, Merklin was responsible for distributing sales leads to Project Consultants in the Kitchen Department.  Every morning, Merklin received information on the day's sales leads that had been set and paired together by the Company's Appointment Center.  The territory covered by SHIP's Orlando office was quite large, and the leads were often paired together by the Appointment Center without enough time for Project Consultants to travel from one appointment to the next.  As the Appointment Center did not have access to sales information, District Sales Managers, including Merklin, were then tasked with rearranging the leads into new books, to allow sufficient time between appointments and assign more prime leads to Project Consultants with higher net closing percentages.  Merklin had less than an hour and a half each morning to re-pair and distribute the day's sales leads.

The core of Plaintiff's discrimination claim is his unsupported, speculative allegation that he received more sales leads in low income / low home value areas than non-minority Project Consultants and was denied leads in higher income / home value neighborhoods.  Company records, however, reflect that Plaintiff was assigned more than his representative share of leads in most of the areas he claims he was denied.  Moreover, a statistical analysis of all kitchen leads assigned in Orlando during Plaintiff's employment establishes that Plaintiff's sales leads were better than the sales leads assigned to non-minority Project Consultants when comparing income and home values.  Plaintiff also claims that he was assigned fewer prime leads than non-minority project consultants between

December 2005 and January 2006.  To the contrary, Plaintiff received a comparable number of prime leads, if not more, than non-minority project consultants during those months.

Notwithstanding the alleged discrimination, SHIP has no record of receiving any internal complaints from Plaintiff. An *anonymous* complaint was received by SHIP's ethics hotline on March 2, 2006, alleging that Merklin was discriminatorily assigning leads and displaying nude pictures of women in the workplace.  The very next day – before Merklin or his managers were aware of the anonymous complaint – Plaintiff was placed on a Performance Plan for Improvement ("PPI") for turning in paperwork late and customer service issues on March 3, 2006.  Contrary to Plaintiff's contention that this PPI was in retaliation for his complaint of discrimination, the PPI had been in preparation for several days before the anonymous complaint was made, and neither SHIP nor Merklin had knowledge that Plaintiff was the anonymous caller.

Human Resources immediately launched an investigation into the anonymous complaint, reviewed the sales distribution data and questioned several project consultants and managers, including Plaintiff.  Plaintiff was the only person interviewed who claimed that sales leads were being distributed in a discriminatory manner.  The remaining Project Consultants, including two other African-Americans, reported they did not believe sales leads were being distributed in a discriminatory manner.  Merklin denied displaying nude photographs.  Only Plaintiff and one other Project Consultant reported that they had been shown nude pictures by Merklin; several other Project Consultants whom Plaintiff reported were also shown the photographs denied seeing them.  Despite a thorough investigation,

Human Resources was unable to substantiate the anonymous complaint.  SHIP did not learn that Plaintiff was the anonymous caller until well after his employment ended.

On April 10, 2006, Plaintiff filed a charge of discrimination alleging Merklin discriminated against him based on his race with regard to sales lead assignments and retaliated against him for complaining of discrimination.

On May 22, 2006, Plaintiff was issued a second PPI for referring a customer to an outside company in violation of SHIP's policy, which Plaintiff claims was retaliatory for his alleged internal complaints and first charge of discrimination.  Plaintiff also contends that Merklin retaliated against him by assigning him a single sales lead in Palm City, Florida, outside the Orlando territory, denying his request for a salary advance, scrutinizing his paperwork, and continuing to assign him leads in low income / low home value areas.  As discussed above, the statistical data clearly shows that Plaintiff received his proportionate share of sales leads in the areas from which he claims he was excluded and that Plaintiff's sales leads were better than those assigned to non-minority Project Consultants when comparing area income and home values.  The remaining alleged retaliatory acts were undertaken for legitimate non-retaliatory reasons.

In June 2006, Plaintiff requested and was granted a medical leave of absence. Although Plaintiff's mental health care provider released him to return to work effective August 24, 2006, Plaintiff failed to contact SHIP or return to work on that date.  As a result, SHIP terminated his employment due to job abandonment.  At no point did Plaintiff tell management he failed to return to work because of alleged workplace discrimination or harassment.

Although not alleged in his charge of discrimination, Plaintiff reported to the EEOC during its investigation that Merklin had allegedly shown him graphic nude photographs of female employees which Merklin claimed to have taken.  Plaintiff alleges that Merklin subjected him to a sexually hostile work environment by displaying the photographs. Plaintiff provided copies of the alleged photographs to the EEOC; he obtained these photographs from Merklin's former fiancée, Deborah Kopatz, long after Plaintiff was no longer employed with SHIP.  Ms. Kopatz, who was angry at Merklin following their breakup, purportedly found the pictures on a CD after Merklin moved out of her home. While Merklin admits taking the pictures, he emphatically denies that he ever showed them to Plaintiff or any other SHIP employees.  Even if the photographs were displayed, however, Plaintiff's sexual harassment claim is without merit as he cannot show that the alleged harassment was based on sex.

Plaintiff's case is based on nothing more than mere supposition, suspicion and conjecture on the part of a Plaintiff who refuses to accept responsibility for his own poor performance.  Plaintiff cannot offer a scintilla of evidence other than his own intuition and opinion in support of his claims.

## IV.    WITNESS LISTS

A.    Plaintiff's Witness List:  Exhibit "A" filed simultaneously herewith.

B.    Defendant's Witness List: Exhibit "B" filed simultaneously herewith.

## V.      EXPERT WITNESSES

A.      Plaintiff will not utilize any expert witness testimony.

B.      Defendant will present the expert witness report and testimony of Susan W. Long, PhD., a statistician, regarding her statistical analysis of the assignment of kitchen sales leads during Plaintiff's employment, and the expert witness report and testimony of Barbara A. Stein, M.D., regarding her independent psychological examination of Plaintiff.

## VI.     EXHIBIT LISTS

Exhibit lists are filed simultaneously herewith, together with opposing party's objections.

A.      Plaintiff's Exhibit List, with Defendant's Objections: Exhibit "C" filed simultaneously herewith.

B.      Defendant's Exhibit List, with Plaintiff's Objections: Exhibit "D" filed simultaneously herewith.

## VII.    STATEMENT OF ELEMENTS OF CLAIM FOR MONEY DAMAGES

A.      Damages Claimed by Plaintiff

Plaintiff, Thomas C. Ridley, will seek economic losses, compensatory damages and punitive damages.

As to economic losses the Plaintiff will show that but for discrimination he should have received commissions of $7,800.00 per month.  Damages, calculated from the first full month that Mr. Merklin became Mr. Ridley's supervisor, September 2005 through the trial

date in December 2009, the total amount he would have earned would have been $405,600.00. As to mitigation, the amount the Plaintiff received while employed by SHIPS of $33,586.58, the post-separation income from Direct Kitchens of approximately $15,875.00 and Nuvox of $21,923.00 the total mitigated amount is approximately $70,000.00 with a net loss of $335,600.00.

In addition to economic losses the Plaintiff will seek compensatory damages. Although the exact amount has not been quantified the Plaintiff will seek a verdict up to the statutory cap by federal law of $300,000.00 per claim.

The Plaintiff will further seek punitive damages, the exact amount has not been quantified and will not be until trial. There is a statutory cap under federal law of $300,000.00 per claim (the cap includes the combined sum of compensatory and punitive damages).

      B.      Damages Claimed by Defendant

Defendant is not claiming any damages. However, should Defendant prevail, it will seek its costs and other relief should the court deem appropriate, such as attorney's fees.


## VIII.   DEPOSITION TESTIMONY TO BE OFFERED INTO EVIDENCE

      A.      <u>Plaintiff</u>

Plaintiff intends to offer the following deposition testimony of Michael K. West, PsyD., and Lowell Merklin into evidence:

<u>Michael K. West, PsyD.</u>

| <u>Page(s)</u> | <u>Line(s)</u> |
|---|---|
| 4 | 19-21 |
| 10 | 1-5, 19-25 |
| 11 | 1-4 |
| 12 | 10-15 |
| 15 | 16-20, 23-25 |
| 16 | 1 |
| 17 | 3-11 |
| 19 | 1-13 |
| 23 | 24-25 |
| 24 | 1-17 |
| 29 | 24-25 |
| 30 | 1-15 |
| 34 | 19-25 |
| 35-42 | all |
| 43 | 1-8, 16-25 |
| 44-45 | all |
| 46 | 1-10 |
| 47-51 | all |
| 52 | 1-23 |
| 53 | 10-16 |
| 54 | 16-25 |
| 55 | 1-5, 15-25 |
| 56 | 1-8 |
| 59 | 9-25 |
| 60 | 1-4, 8-25 |
| 61 | all |
| 62 | 1-3, 9-24 |
| 63 | 1-19 |
| 65 | 2-25 |
| 66-72 | all |
| 73 | 1-6 |
| 74 | 3-25 |
| 75-78 | all |
| 79 | 1-7, 14-25 |
| 80 | all |
| 81 | 1-17, 18-25 |
| 82 | 1-8 (sexual harassment) |
| 83 | 7-17 |
| 92 | 16-25 |
| 93 | 1-8 |

| | |
|---|---|
| 95 | 10-25 |
| 96 | 1-12, 20-25 |
| 97 | 1-5 |
| 98 | 9-25 |
| 99 | 1-11 |

Lowell Merklin

| Page(s) | Line(s) |
|---|---|
| 4 | 18-24 |
| 6 | 9-17 |
| 7 | 17-21 |
| 8 | 14-24 |
| 9 | all |
| 10 | 1, 8-12 |
| 11 | 5-20 |
| 12 | 6-12, 20-21, 24 |
| 13 | 1-3 |
| 14 | 2-4, 12-24 |
| 15 | 1-10 |
| 18 | 3-20 |
| 19 | 6-11, 15-21 |
| 26 | 11-24 |
| 27-31 | all |
| 32 | 1-14 |
| 33-38 | all |
| 39 | 1-5, 9-24 |
| 40-50 | all |
| 51 | 10-13 |
| 56 | 2-17 |
| 60 | 13-24 |
| 61 | all |
| 62 | 1-9 |
| 64 | 11-24 |
| 65 | 1-15, 12-24 |
| 66 | 1-22 |
| 68 | 11-24 |
| 69 | 1-16 |
| 74 | 13-24 |
| 75 | 1-7 |
| 76 | 19-24 |
| 77 | 1-21 |
| 79 | 17-24 |

| | |
|---|---|
| 80 | 1-22 |
| 81 | 16-24 |
| 82 | 22-24 |
| 83 | 6-16 |
| 97 | 21-24 |
| 98 | 1-6 |

Plaintiff may also offer the deposition testimony of other witnesses for possible use for impeachment or rebuttal.   In the unlikely event a witness becomes unavailable, Plaintiff may seek the Court's permission to publish pages and lines of deposition testimony at that time.


B.     Defendant

Defendant intends to offer the following deposition testimony of Michael K. West, Psy D. ABPP, and Lowell Merklin (if he is unavailable for trial) into evidence:

Michael K. West, PsyD.

| Page(s) | Line(s) |
|---|---|
| 9 | 22-25 |
| 14 | 8-25 |
| 15 | 1-15 |
| 18 | 24-25 |
| 19 | 24-25 |
| 20 | 1-10 |
| 21 | 4-11 |
| 25 | 10-11 |
| 30 | 4-15 |
| 35 | 17-25 |
| 36 | 22-25 |
| 37 | 1-3; 8-25 |
| 38 | 1-25 |
| 39 | 1-14; 24-25 |
| 40 | 1-25 |
| 41 | 1-25 |
| 42 | 1-25 |

| | |
|---|---|
| 43 | 1-25 |
| 44 | 1-25 |
| 45 | 1-18 |
| 46 | 1-20 |
| 47 | 14-25 |
| 48 | 1-7 |
| 49 | 3-9; 21-25 |
| 50 | 1-19 |
| 51 | 10-15; 20-25 |
| 52 | 1-25 |
| 53 | 1-16 |
| 54 | 16-25 |
| 55 | 1-5 |
| 56 | 18-25 |
| 57 | 1-25 |
| 58 | 1-25 |
| 59 | 1-22 |
| 62 | 4-8 |
| 75 | 9-12 |
| 76 | 4-11 |
| 81 | 15-17 |
| 83 | 7-25 |
| 84 | 1-9; 19-22 |
| 86 | 4-11 |
| 87 | 11-25 |
| 88 | 1-25 |
| 89 | 1-16 |
| 90 | 8-25 |
| 91 | 1-11; 18-25 |
| 92 | 1-25 |
| 93 | 1-8 |
| 94 | 5-25 |
| 95 | 1-5 |
| 97 | 6-13 |
| 98 | 9-19 |
| 99 | 25 |
| 100 | 1-4 |

<u>Lowell Merklin</u>

| <u>Page(s)</u> | <u>Line(s)</u> |
|---|---|
| 3 | 8-10 |
| 4 | 18-24 |

| | |
|---|---|
| 5 | 1-24 |
| 6 | 1-24 |
| 7 | 1-21 |
| 8 | 14-23 |
| 17 | 9-24 |
| 18 | 1-2 |
| 19 | 15-24 |
| 20 | 4-13 |
| 21 | 6-22 |
| 26 | 11-24 |
| 27 | 1-24 |
| 28-31 | all |
| 32 | 1-14 |
| 33-38 | all |
| 39 | 1-5; 19-24 |
| 40 | 1-24 |
| 42 | 1-24 |
| 43 | 1-23 |
| 44 | 5-24 |
| 45-50 | all |
| 51 | 10-13; 17-23 |
| 54 | 24 |
| 55 | 1-3; 18-24 |
| 56 | 1-24 |
| 57 | 1-2; 20-24 |
| 58 | 1-18 |
| 59 | 1-10; 15-24 |
| 60 | 1-24 |
| 61 | 1-10; 16-24 |
| 62 | 1-11; 15-24 |
| 63 | 1-11; 15-24 |
| 64 | 1-6; 11-15 |
| 65 | 12-24 |
| 66 | 1-22 |
| 67 | 10-24 |
| 68 | 1-24 |
| 69 | 1-24 |
| 70 | 1-7; 8-19 |
| 72 | 16-20; 24 |
| 73 | 1-18 |
| 76 | 9-14; 19-24 |
| 77 | 1-24 |
| 78 | 9-11; 15-24 |
| 79 | 1-14 |

| | |
|---|---|
| 83 | 11-16 |
| 84 | 18-24 |
| 85 | 10-24 |
| 86 | 1-24 |
| 87 | 1-24 |
| 88 | 1-24 |
| 89 | 1-17 |
| 90 | 2-24 |
| 91 | 1-5; 13-24 |
| 92 | 1-24 |
| 93 | 1-9 |
| 94 | 1-24 |
| 95 | 1-24 |
| 96 | 1-6 |
| 101 | 11-14; 20-24 |
| 102 | 1-9 |

Defendant may also offer the deposition testimony of other witnesses for possible use for impeachment or rebuttal. In the unlikely event a witness becomes unavailable, Defendant may seek the Court's permission to publish pages and lines of deposition testimony at that time.

IX.   **CHARTS, GRAPHS, MODELS, SCHEMATIC DIAGRAMS AND SIMILAR OBJECTS**

The following is a list and brief description of any charts, graphs, models, schematic diagrams and similar objects which, although not to be offered in evidence, counsel intends to use in opening statements or closing arguments:

A.   Plaintiff: Plaintiff may enlarge any of the exhibits for display purposes. Plaintiff may have other demonstrative aids as determined before the time period set forth below.

B.    Defendant:  Defendant may utilize charts or graphs as follows:

1.    A timeline depicting the chronology of certain facts and events;

2.    A chart or graph illustrating Plaintiff's sales performance throughout his employment;

3.    A chart or graph showing the distribution of prime leads to Plaintiff and his alleged comparators;

4.    A chart or graph illustrating the statistical analysis of the sales leads assigned to Plaintiff versus non-minority Project Consultants;

5.    A chart or graph showing the distribution of sales leads in areas from which Plaintiff claims he was excluded; and

6.    A chart or graph depicting the sales territory covered by Defendant's Orlando and Miami offices.

Defendant may also enlarge any of the exhibits for display purposes. Defendant may have other demonstrative aids as determined before the time period set forth below.

The parties agree that if demonstrative exhibits are to be used, they will be submitted to opposing counsel at least three (3) weeks prior to trial and, if there is opposition to their use, the dispute will be submitted to the Court at least one (1) full week before trial.

X.    **ADMITTED FACTS REQUIRING NO PROOF AT TRIAL, TOGETHER WITH SPECIFIC RESERVATIONS**

1.    SHIP is a Delaware corporation doing business in Orlando, Florida.

2.    SHIP is a retailer of home improvement products and services.

3.      Plaintiff is a black male.

4.      Plaintiff was hired by SHIP on May 16, 2005 as a Project Consultant in the Kitchen Department of SHIP's Orlando, Florida office.

5.      Plaintiff was granted a medical leave of absence beginning on June 14, 2006.

6.      Plaintiff was released to return to work by his health care provider on August 24, 2006.

7.      Plaintiff's last day worked at SHIP was June 13, 2006.

8.      Plaintiff did not return to work at SHIP following his medical leave of absence.

9.      As a Project Consultant, Plaintiff was assigned pre-set sales appointments and was responsible for making in-home sales presentations to consumers during the scheduled appointment time frames to sell SHIP's kitchen remodeling and cabinet refacing products.

10.     Plaintiff, like all Project Consultants, was compensated solely on a commission basis based on products sold.

11.     During Plaintiff's employment, he was supervised by District Sales Manager Lowell Merklin.

12.     Lowell Merklin reported directly to Orlando Metro Sales Manager Jim Poole.

13.     At the time of his hire, Plaintiff received a copy of SHIP's employee handbook, which contained the Company's Equal Employment Opportunity Policy ("EEO

Policy").

14.     SHIP's EEO Policy strictly prohibits discrimination against an applicant, associate, vendor, contractor or customer on the basis of race, and provides zero tolerance for retaliation against an individual who in good faith reports a perceived violation of the policy.  The EEO Policy identifies persons to whom employees may complain of perceived discrimination, including their immediate supervisor or manager, their manager's manager or human resources, and also provides a toll-free phone number to report complaints of discrimination.

15.     Pursuant to SHIP's Standard Operating Procedures Manual ("SOP Manual"), sales leads are to be assigned based on the quality of the lead.  Prime leads, where both homeowners are present, are considered the highest quality sales leads because the presence of both decision makers during the sales call increases the likelihood that a sale will be closed that day.

16.      "Net closing percentage" is the percentage of prime leads that a Project Consultant successfully sold.  Plus leads that are not closed are not included in calculating the net closing percentage.

17.     Project Consultants are required to maintain a net closing percentage at or above a specified target level.

18.     The territory covered by SHIP's Orlando office was quite large, and the leads were often paired together by the Appointment Center without enough time for Project Consultants to travel from one appointment to the next.

19.     The Appointment Center did not have access to Project Consultant's net closing percentages.

20.     District Sales Managers, including Merklin, were tasked with rearranging sales leads into new books to allow sufficient time between appointments and assign more prime leads to Project Consultants with higher net closing percentages.

21.     Merklin had approximately an hour and a half each morning to re-pair and distribute the day's sales leads.

22.     At the time of his termination from SHIP, Plaintiff's average monthly earnings were approximately $2,400.00.

23.     In July 2006 – while he was on medical leave from SHIP – Plaintiff began new full-time employment with Direct Kitchens of America, where his average monthly earnings were approximately $1,540.00.

24.     Plaintiff voluntarily resigned from his position with Direct Kitchens of America in May 2007 because he was not satisfied with his earnings and had a personality conflict with the owner, Warren Campbell, Plaintiff's former co-worker at SHIP.

25.     Plaintiff also worked as a self-employed handy man in 2006 and 2007, earning a total of approximately $5,000.00.

26.     On October 8, 2007, Plaintiff began new full-time employment with FDN Communications, Inc., n/k/a/ Nuvox Communications where his average monthly earnings were approximately $2,300.00.

27.     Plaintiff separated from employment with Nuvox Communications on July 1, 2008.

28.     Plaintiff has not worked since July 1, 2008.

29.     On March 2, 2006, SHIP's ethics hotline received an anonymous complaint alleging that Merklin was discriminatorily assigning leads and displaying nude pictures of women in the workplace.

30.     A Performance Improvement Plan ("PPI") was issued to Plaintiff by SHIP Metro Sales Manager Jim Poole on March 3, 2006.

31.     On April 10, 2006, Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCRA") alleging race discrimination in lead assignments and retaliation.

32.     A second Performance Improvement Plan ("PPI") was issued to Plaintiff by SHIP Metro Sales Manager Jim Poole on May 22, 2006.

33.     The Daytona area was within the sales territory covered by SHIP's Orlando office during Plaintiff's employment with SHIP.

34.     Under SHIP's policies and practices, a Project Consultant is ineligible for a salary advance if he has recently been issued any PPI's.

35.     Under SHIP's policies and practices, a Project Consultant must have future commissions pending to be eligible for a salary advance.

36.     SHIP District Sales Managers are responsible for reviewing all sales contract paperwork submitted by Project Consultants to ensure that paperwork is complete and error-free.

## XI.   CONCISE STATEMENT OF THOSE ISSUES OF LAW ON WHICH THERE IS AGREEMENT

### A.   RACE DISCRIMINATION DISPARATE TREATMENT UNDER TITLE VII:

A plaintiff may prove disparate treatment under Title VII using either direct evidence or circumstantial evidence. *Burke-Fowler v. Orange County,* 447 F.3d 1319, 1323 (11th Cir. 2006). Direct evidence is defined as "evidence which, if believed, would prove the existence of a fact [in issue] without inference or presumption." *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir. 1990).

Claims based on circumstantial evidence are evaluated under the *McDonnell Douglas* burden shifting framework. *Burke-Fowler,* 447 F.3d at 1323. Under *McDonnell Douglas Corp.,* to establish a *prima facie* case of disparate treatment, a plaintiff must establish: (1) he is a member of a protected class; (2) he was qualified for the job; (3) he was subjected to an adverse employment action; and (4) his employer treated similarly situated employees who were not members of his protected class more favorably. *Graham v. Wal-Mart Stores, Inc.,* 2005 U.S. Dist. LEXIS 25364, *16-17 (M.D. Fla. Oct. 27, 2005). If a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its challenged employment action. *Smith v. Ca, Inc.,* 2008 U.S. Dist. LEXIS 106142, *19 (M.D. Fla. Dec. 30, 2008). If the defendant proffers such legitimate reasons, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reasons were mere pretext. *Id.*

To establish an adverse employment action, the employee must show "a serious and material change in the terms, conditions, and privileges of employment. . . . as viewed by a reasonable person in the circumstances." *Kolczynski v. United Space Alliance,*

*LLC,* 2005 U.S. Dist. LEXIS 21374, *8 (M.D. Fla. Sept. 27, 2005).   A plaintiff must show that there were employees outside his protected class who were similarly situated to him in all relevant respects but who were treated more favorably.   *Gaston v. Home Depot USA, Inc.,* 129 F. Supp. 2d 1355, 1368 (S.D. Fla. 2001).


### B.      SAME-SEX HARASSMENT UNDER TITLE VII:

To establish a gender based hostile work environment claim under Title VII, Plaintiff must show (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) a basis for holding the employer liable.   See McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008).   A "man can state a claim under Title VII for sexual harassment by another male *only* if he is being harassed *because* he is a man."   Abbot v. Mike Raisor Ford, Inc., 896 F. Supp. 805, 806-07 (N.D. Ind. 1995).   The United States Supreme Court has listed three ways to show that same-sex harassment is based on sex: (1) the harasser was homosexual and motivated by sexual desire; (2) the harassment was motivated by a general hostility to the presence of a particular gender in the workplace; or (3) there is a contrast between how the harasser treated both sexes in a "mixed-sex workplace."   See Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80-81 (1998).   Courts are clear that "[t]hough the materials and means of harassment contain sexual content and connotations, that does not automatically mean that the motivations for such harassment satisfies the 'because of sex' requirement of the statute." Bianci v. City of Philadelphia, 183 F. Supp. 2d 726, 738 (E.D. Pa. 2002).

When determining whether harassment is objectively severe or pervasive, courts consider (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's job performance.  See Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999).

C.     **RETALIATION UNDER TITLE VII**:   To establish a *prima facie* case of retaliation under Title VII, the employee must show that (1) he or she engaged in a statutorily protected expression; (2) he or she suffered an employment action that a reasonable employee would have found materially adverse (i.e. that the challenged action could well dissuade a reasonable employee from engaging in protected conduct); and (3) there is some causal relationship between the two events.  Once the employee makes out a prima facie case, the burden of production shifts to the employer to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action.  *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006).

If the employer offers legitimate reasons, the presumption of retaliation disappears. The employee must then show, by a preponderance of the evidence, that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct.  *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997). The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on Plaintiff.  *See Pennington*, 261 F.3d at 1266.

D.      **CONSTRUCTIVE DISCHARGE:**

To prove constructive discharge, a plaintiff must demonstrate that "working conditions were so intolerable that a reasonable person in the plaintiff's position would have felt compelled to resign." *Durley v. APAC, Inc.*, 236 F.3d 651, 658 (11th Cir. 2000).  The threshold for a constructive discharge "is quite high."  *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001).  "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment."  *Id., citing Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992).  In assessing constructive discharge claims, the court does not consider a plaintiff's subjective feelings about his employer's actions.  Rather, it determines whether a reasonable person in the plaintiff's position would be compelled to resign.  *See Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1450 (11th Cir. 1998).

E.      **AGREED INADMISSIBLE EVIDENCE:**

The parties agree that the determination issued by the Florida Commission on Human Relations and the U.S. Equal Employment Opportunity Commission's Notice of Dismissal and Right to Sue issued in connection with Plaintiff's charge of  discrimination shall not be admissible at trial.

**XII.    ISSUES OF FACT WHICH REMAIN TO BE LITIGATED**

1.      Whether the SOP Manual dictates that sales leads be distributed to Project Consultants "primarily with consideration to net closing percentage by product and positive attitude."

2.      Whether sales leads were assigned disproportionately to Project Consultants on the basis of race.

3.      Whether Plaintiff's race was a motivating factor in Merklin's assignment of sales leads to Plaintiff.

4.      Whether Plaintiff made an internal complaint of race discrimination, sexual harassment, or retaliation to SHIP other than the March 2, 2006 anonymous hot-line call.

5.      When Merklin and Jim Poole learned that Plaintiff was the source of the March 2, 2006 anonymous complaint.

6.      When Jim Poole decided to issue the March 3, 2006 PPI to Plaintiff.

7.      Whether SHIP undertook a prompt and thorough investigation of the anonymous complaint alleging race discrimination in lead assignments received by SHIP's Ethics Hotline in March 2006.

8.      Whether Merklin scrutinized sales contract paperwork submitted by all Project Consultants under his supervision.

9.      Whether Merklin denied vacation days requested by Plaintiff in April 2006.

10.     Whether Plaintiff was subjected to any materially adverse employment action which would have dissuaded a reasonable employee from engaging in protected conduct after making his alleged internal complaints and charge of discrimination.

11.     Whether there is a causal connection between Plaintiff's alleged internal complaints and charge of discrimination and the PPI's issued to him on March 3 and

May 22, 2006.

       12.    Whether there is a causal connection between Plaintiff's alleged internal complaints and charge of discrimination and the denial of salary advances requested by Plaintiff.

       13.    Whether there is a causal connection between Plaintiff's alleged internal complaints and charge of discrimination and Merklin's scrutiny of Plaintiff's paperwork.

       14.    Whether there is a causal connection between Plaintiff's alleged internal complaints and charge of discrimination and the leads subsequently assigned to Plaintiff.

       15.    Whether there is a causal connection between Plaintiff's alleged internal complaints and charge of discrimination and Merklin's alleged denial of vacation days requested by Plaintiff in April 2006.

       16.    Whether Plaintiff was issued the March 2 and May 22, 2006 PPI's for legitimate, non-retaliatory reasons.

       17.    Whether Plaintiff was denied a salary advance for a legitimate, non-retaliatory reason.

       18.    Whether Merklin scrutinized Plaintiff's paperwork for a legitimate, non-retaliatory reason.

       19.    Whether Merklin's alleged denial of vacation days requested by Plaintiff in April 2006 was for a legitimate, non-retaliatory reason.

       20.    Whether Defendants' legitimate non-retaliatory reasons for its actions

were pretext for discrimination.

21.     Whether Merklin displayed sexual/nude photographs to Plaintiff.

22.     Whether the alleged display of sexual/nude photographs was based on sex.

23.     Whether the alleged display of sexual/nude photographs was objectively severe and pervasive.

24.     Whether Plaintiff subjectively perceived the alleged display of sexual/nude photographs to be abusive.

25.     Whether a reasonable person in Plaintiff's position would have been compelled to not return to employment at SHIP.

26.     Whether Plaintiff sustained any damages.

27.     Whether Plaintiff failed to mitigate his damages.

28.     Whether Plaintiff had compelling or justifiable reason for resigning his employment with Direct Kitchens of America.

29.     Whether Plaintiff made a reasonable and good faith effort to maintain his employment with Nuvox Communications.

30.     If Plaintiff sustained any damages then the amount of Plaintiff's damages.

31.     Whether Defendant acted lawfully, reasonably, and in good faith toward Plaintiff.

**XIII.  ISSUES OF LAW FOR DETERMINATION BY THE COURT**

1.      Whether each party has met the applicable burdens of proof of their claims or defenses.

2.      Whether Plaintiff has established a claim for punitive damages sufficiently to be submitted to the jury.

**XIV.  MOTIONS OR OTHER MATTERS REQUIRING ACTION BY THE COURT**

A.      Defendant's motion for summary judgment (Doc. 28) filed July 17, 2009, is at issue and remains pending.  Plaintiff filed his opposition on August 17, 2009 (Doc. 31).

B.      The parties' joint motion for a trial date certain (Doc. 37), requesting that the trial of this matter be set to begin on a date certain of December 14, 2009 or such other day available on the Court's December 2009 docket, remains pending.

**C.**      Plaintiff and Defendant contemplate filing motions in limine on or before the October 13, 2009 deadline for such motions as extended by the Court's Order dated September 29, 2006 (Doc. 36).

**XV.   JOINT PROPOSED *VOIR DIRE* QUESTIONS**

The parties joint proposed *voir dire* questions are attached as Exhibit "E."

**XVI.  JOINT PROPOSED JURY INSTRUCTIONS**

The parties joint proposed jury instructions, with exceptions noted, are attached as Exhibit "F."

**XVII.  PROPOSED VERDICT FORMS**

    **A.**  Plaintiff's proposed verdict form is attached as Exhibit "G."

    **B.**  Defendant's proposed verdict form is attached as Exhibit "H."

**XVIII.  DISAGREEMENTS AS TO APPLICATION OF THE RULES OF EVIDENCE OR THE FEDERAL RULE OF CIVIL PROCEDURE**

    There are presently no disagreements between the parties as to the application of the Federal Rules of Evidence or of the Federal Rules of Civil Procedure to this action.

**XIX.  ESTIMATE OF NUMBER OF TRIAL DAYS REQUIRED**

    The parties estimate that this jury trial will take approximately three (3) to five (5) days.

**XX.  STATEMENT DESCRIBING ANY OTHER MATTERS THAT MIGHT EXPEDITE A DISPOSITION OF THIS CASE**

    None.

**XXI.  CERTIFICATION OF COMPLIANCE WITH CASE MANAGEMENT AND SCHEDULING ORDER**

    This pretrial stipulation has been formulated after a conference of counsel for the respective parties.  Reasonable opportunity has been afforded counsel for corrections, or additions, prior to signing.  Hereafter, this stipulation will control the course of the trial and may not be amended except by consent of the parties and the Court, or by order of the Court to prevent manifest injustice.

## XXII. CERTIFICATION REGARDING SETTLEMENT POSSIBILITIES

The possibility of settlement of this case was considered and has been determined to be remote.

## XXIII. SIGNATURES OF COUNSEL FOR ALL PARTIES

Respectfully submitted this 6th day of October, 2009.

| | |
|---|---|
| Edward R. Gay, Esquire | JACKSON LEWIS LLP |
| 1516 East Concord Street | 390 North Orange Avenue, Suite 1285 |
| Orlando, Florida 32803 | Post Office Box 3389 |
| Telephone:  (407) 898-1871 | Orlando, Florida 32802-3389 |
| Facsimile:   (407) 897-7042 | Telephone:     (407) 246-8440 |
| | Facsimile:     (407) 246-8441 |

By:     _/s/ Edward R. Gay_____           By:     _/s/ Joanne B. Lambert_____
        Edward R. Gay, Esquire                          Joanne B. Lambert
        Florida Bar #: 342084                          Florida Bar No. 0899062
        edgay@bellsouth.net                          lambertj@jacksonlewis.com

Attorney for Plaintiff, THOMAS C. RIDLEY
        Alicia M. Chiu
        Florida Bar No. 0058366
        chiua@jacksonlewis.com

Attorneys for Defendant, SEARS HOME IMPROVEMENT PRODUCTS, INC.