**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**THOMAS C. RIDLEY,**

       **Plaintiff,**

-vs-                                          **Case No. 6:08-cv-749-Orl-28GJK**

**SEARS HOME IMPROVEMENT**
**PRODUCTS, INC.,**

       **Defendant.**

_____

## ORDER

Thomas C. Ridley ("Ridley") brings the instant action against Sears Home Improvement Products, Inc. ("SHIP") alleging multiple violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), including racial discrimination (Count I), retaliation (Count II), constructive discharge (Count III), and sexual harassment (Count IV).[1] (Am. Compl., Doc. 13). This cause is currently before the Court on the Motion for Summary Judgment (Doc. 28) filed by SHIP. Ridley has filed a Response (Doc. 31) thereto, and the matter is now ripe for adjudication. Upon consideration of the parties' briefs, the record evidence, and the relevant law, the Court concludes that the Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART** for the reasons stated below.

---

[1] Ridley also brought a claim for religious discrimination (Count V). However, he later filed an unopposed motion to dismiss Count V (Doc. 30), a request granted by this Court's August 20, 2009 Order (Doc. 33).

## I. Facts

SHIP is a Delaware corporation that provides home improvement products and services. (Joint Pretrial Statement, Doc. 38 at 18). On May 16, 2005, Ridley, who identifies himself as a black male, began his employment with SHIP as a Project Consultant in the Kitchen Department of SHIP's Orlando, Florida office. (Id. at 18-19). As a Project Consultant, Ridley was required to make in-home sales presentations to consumers during pre-set appointments known as "leads" and was compensated solely on a commission basis determined by the products sold at these in-home sales presentations. (Id. at 19).

Lowell Merklin ("Merklin"), the District Sales Manager for the Orlando area and Ridley's supervisor for the times relevant to this action, was responsible for distributing leads to the Project Consultants in the Kitchen Department on a daily basis. (Id.; Merklin Aff. ¶ 6). Merklin would receive between twenty-five to forty leads from the Appointment Center at approximately 7:00 a.m. each morning, and these leads would be grouped by the Appointment Center into lead books usually containing two leads per book. (Id. ¶¶ 16-18). Under SHIP's Standard Operating Procedure ("SOP") Manual, leads were to be assigned based on the quality of the lead,[2] and the distribution of leads among the Project Consultants "should be done primarily with consideration to net closing percentage (by product) and

---

[2] Leads are broken into three categories: (1) prime leads—leads where both homeowners are present; (2) plus leads—one homeowner is present or a nonprimary residence; (3) special projects—insurance repairs and customers who did not purchase products after a prior sales presentation. (Merklin Aff. ¶¶ 8-9). Prime leads are considered the highest quality lead because of the increased likelihood of closing a sale on the day of the visit due to the presence of both decision makers. (Doc. 38 at 20).

positive attitude."[3] (SOP Manual at 9). The SOP Manual also provided that "special requests as to times or locations of appointments may be considered." (Id.). However, because the Appointment Center did not have access to the Project Consultants' net closing percentages and because the Appointment Center would pair leads together without consideration for the time necessary to travel between appointments, Merklin was required to rearrange the leads into new books to account for the Project Consultants' net closing percentages and to allow sufficient travel time between appointments. (Doc. 38 at 20-21). Merklin was required to have these leads rearranged prior to 8:30 A.M. each morning when the leads were to be distributed to the Project Consultants. (Merklin Aff. ¶ 17).

On March 2, 2006, SHIP received an anonymous complaint to its ethics hotline, alleging that Merklin assigned leads in a discriminatory manner and that he was displaying nude photographs of women at the workplace. (Doc. 38 at 22). The next day, Jim Poole ("Poole")—the Orlando Metro Sales Manager and Merklin's direct supervisor—issued Ridley a Performance Plan for Improvement ("PPI") for a violation of company policy—specifically, for turning in paperwork late and for communication problems with customers and the production department that created problems with customer satisfaction levels and installations.[4] (See March PPI, Ex. 11 to Ridley Dep.). Charles Klinzing ("Klinzing"), a

---

[3]"Net closing percentage" is calculated as the percentage of sales made from prime leads. (Doc. 38 at 20). Plus leads that do not result in a sale are not included in determining net closing percentage. (Id.). However, if a Project Consultant does close a sale on a plus lead, that lead is converted to a prime lead and the Project Consultant receives the concordant benefit to his net closing percentage. (Merklin Dep. at 87-88).

[4]On its face, the March PPI states that Poole prepared it on March 2, 2006, the same date that the anonymous complaint was received. (See March PPI, at 1). However, the

Regional Human Resources Manager for SHIP, investigated the anonymous complaint in March 2006 and interviewed at least eight Project Consultants who reported to Merklin, including three African-Americans. (Klinzing Aff. ¶¶ 5, 7, 9). Of the Project Consultants questioned, only Ridley—who Klinzing learned was the source of the anonymous complaint after Ridley's employment with SHIP had ended—stated that he believed leads were being distributed in a discriminatory manner. (Id. ¶ 8). After conducting numerous interviews and reviewing the lead assignments, Klinzing concluded his investigation and determined that Merklin was assigning the leads "in a nondiscriminatory manner and consistent with SHIP policies." (Id. ¶ 11).

Ridley filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR") on April 19, 2006, alleging race discrimination in the assignment of leads. (Ex. 18 to Ridley Dep. II). In a letter dated May 16, 2006, SHIP responded to the FCHR, denying Ridley's complaint of unlawful discrimination and including an affidavit signed by Merklin on May 17, 2006 affirming that the information contained in the letter regarding him was accurate. (Exs. J & K to Ridley Aff.). Approximately five days later, Poole issued a second PPI to Ridley for violating company policy, this time for referring a customer to another company for granite countertops. (See Ex. 12 to Ridley Dep.).

Ridley's last day on the job for SHIP was June 13, 2006. (Doc. 38 at 19). On June 14, 2006, Ridley was granted a medical leave of absence. (Id.). After his health care

---

parties have stipulated in the Pretrial Statement that the March PPI was issued on March 3. (Doc. 38 at 22).

provider released him to return to work effective August 24, 2006,[5] (id.) Ridley did not return to work or contact SHIP regarding his intent to return to work.  SHIP sent him a letter on September 19, 2006 providing written notice of his termination effective August 24, 2006 for job abandonment due to his failure to return to work.  (Ex. 17 to Ridley Dep. Part II).  On February 8, 2008, the EEOC mailed Ridley a Right-to-Sue letter, and Ridley filed his initial Complaint with this Court on May 8, 2008.

## II.  Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of establishing that no genuine issues of material fact remain.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations."  Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).  "A nonmoving party, opposing a motion for summary judgment supported by affidavits [or other relevant evidence,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991); see also Fed. R. Civ. P. 56(e)(2) (providing

---

[5] Ridley began full-time employment with Direct Kitchens of America in July 2006 while on medical leave from SHIP, a position that he retained until May 2007, when he voluntarily resigned due to dissatisfaction with his earnings and a "personality conflict" with the owner. (Doc. 38 at 21).

that the nonmovant "must . . . set out specific facts showing a genuine issue for trial").

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. Some degree of factual dispute is expected, but to defeat a motion for summary judgment the factual dispute must be material and genuine. That is, the factual evidence must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

### III. Analysis

Ridley's Amended Complaint asserts various causes of action against SHIP under Title VII. In its motion, SHIP requests summary judgment in its favor as to all remaining counts. The Court now examines each claim in turn.

#### A. Count I—Racial Discrimination

Title VII provides that it is unlawful for any employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In Count I, Ridley alleges that SHIP violated Title VII by discriminating against him on the basis of his race. (Am. Compl. ¶ 5). Specifically, Ridley asserts that

> Sales leads . . . were distributed by [Merklin] in a discriminatory manner. [Ridley] was given leads to predominantly poor, minority communities whose leads of sales to calls (closing ratios) were the lowest in the territory for the

> facility that [Ridley] operated out of. However, other employees, who were not minorities who were employed under [Merklin] were given their leads in communities with significant higher average incomes and closing rations [sic].

(Id. ¶ 5.A).

Where a plaintiff presents no direct evidence of discrimination, he may prove discrimination through circumstantial evidence under the framework established by the U.S. Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1082-83 (11th Cir. 1996). Under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. For claims of racial discrimination, a plaintiff establishes a prima facie case by showing that (1) he belongs to a protected class; (2) he was qualified to do the job; (3) his employer treated similarly situated employees outside his class more favorably; and (4) he was subjected to an adverse employment action. Hall v. Ala. Ass'n of Sch. Bds., 326 F.3d 1157, 1166 (11th Cir. 2003). "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

Once a plaintiff has established his prima facie case, the burden then shifts to the defendant to produce a "legitimate, nondiscriminatory reason" for the allegedly discriminatory employment action. McDonnell Douglas, 411 U.S. at 804. "If the employer meets this burden of production, the presumption of discrimination is eliminated and the plaintiff must then establish that each of the defendant's proffered reasons is pretextual." Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005). "The inquiry into pretext requires the court to determine, in view of all the evidence, 'whether the plaintiff has cast

sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct.'" Crawford, 529 F.3d at 976 (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir.1997)).

SHIP argues that Ridley's claim for discrimination fails because he has not established a prima facie case in two respects: (1) because "he cannot establish [that] he was treated any differently than non-minority Project Consultants;" and (2) because "many of the petty slights alleged by [Ridley] do not amount to an adverse employment action." (Doc. 28 at 16). The Court agrees.

Ridley's contention that white Project Consultants received more leads in higher income and home value areas is not supported by the evidence. Ridley's primary complaint is that he received leads in neighborhoods with low incomes and low home values. Though Ridley admits not knowing the number of leads, the average closing ratios, or average dollar value per sale for these neighborhoods, (Ridley Dep. at 138-42), he argues that he should have been assigned more leads in neighborhoods such as Windermere, Longwood, Lake Mary, Dr. Philips, Heathrow, Winter Garden, Winter Park, Gotha, and Celebration—neighborhoods that Ridley perceived as "better." (Ridley Dep. at 139-40). The evidence, however, indicates that Ridley received an average, if not above average, distribution of leads in these neighborhoods.[6]

---

[6]The record reflects that the distribution of leads in these neighborhoods during Ridley's employment were as follows:
   Windermere—9 leads given to 6 Project Consultants, Ridley received 1
   Longwood—70 leads given to 19 Project Consultants, Ridley received 7

Ridley also claims that Merklin assigned him "significantly more leads to lower income and lower household homes than other non-African American sales personnel." (Doc. 38 at 2). However, the record evidence does not support this claim either. SHIP has introduced the report of Dr. S.W. Long, Ph.D. ("Dr. Long"), an expert retained by SHIP to analyze Ridley's leads. Using the average household incomes and home values for each lead taken from zip codes using the 2000 Census, Dr. Long calculated the average and median household incomes for the sales leads assigned to Ridley versus those assigned to the non-African American Project Consultants. (Long Aff. ¶¶ 7, 11). Dr. Long found that "both the averages and the medians [of the leads assigned to Ridley] are greater than for the non-African American sales persons." (Long Report at 1). Dr. Long's analysis reveals that the average home value and household income for Ridley's leads were $107,809 and $43,196 respectively; in contrast, the home values and household income for the leads assigned to non-African American Project Consultants averaged $106,559 and $42,299. (Ex. A to Long Report). Additionally, Ridley's leads had a higher median for both home values and household income as well. (Id.). Ridley has not produced any evidence rebutting Dr. Long's report or demonstrating that his co-workers received "better" leads.

---

    Lake Mary—36 leads given to 15 Project Consultants, Ridley received 3
    Dr. Phillips—44 leads given to 16 Project Consultants, Ridley received 4
    Winter Garden—25 leads given to 12 Project Consultants, Ridley received 5
    Winter Park—69 leads given to 17 Project Consultants, Ridley received 5
    Heathrow—Ridley received 1 of 3 leads
    Gotha and Celebration—14 total leads with Ridley, as many other Project Consultants, receiving none of these leads
(Merklin Aff. ¶¶ 28-29).

Ridley also complains that Merklin discriminated against him in a variety of other manners such as: (1) failing to train Ridley as much as Ridley desired; (2) requiring Ridley to arrive at the office at 7:00 a.m. if he desired to pick the leads he wanted; (3) assigning Ridley leads in Miami; (4) sending Ridley on "phantom leads"—leads where no customer was home; (5) yelling at Ridley in a derogatory manner; (6) telling Ridley, "You black guys aren't the only ones who have big dicks"; and (7) asking if the parents of Ridley's Orthodox Jewish girlfriend approved of their relationship and recognized the child that they had out of wedlock. The record, however, reflects that Ridley has not established that Merklin treated him any differently than other nonminority Project Consultants. For example, Ridley himself stated that he has no knowledge of whether other Project Consultants received the type of training that Ridley desired, (Ridley Dep. at 123), and that Merklin yelled at other Project Consultants, (id. at 196).[7]

As the record contains evidence establishing that Ridley received equivalent—if not better—leads than similarly situated non-African American counterparts, Ridley has failed to carry his burden of establishing a prima facie case for race discrimination in the distribution of leads. Nor has Ridley established that he was treated differently than similarly situated non-African American counterparts with regards to his laundry list of perceived slights. Accordingly, summary judgment in favor of SHIP is proper regarding Ridley's claim that Merklin distributed leads in a discriminatory manner on the basis of the values of the

---

[7]Even if Ridley had provided sufficient evidence to infer that Merklin had treated Ridley differently than nonminority Project Consultants, this behavior, though boorish and not to be condoned, would not rise to the level of an "adverse employment action" required to state a prima facie case.

leads and on the other incidents discussed above.

Ridley also claims that Merklin discriminated against him by refusing to give him sufficient prime leads to reach his bonus level. Ridley avers that Merklin gave "quality leads to non-minorities sales representatives who were close to bonuses in order to obtain the requisite sales numbers" but did not do the same for Ridley when he requested prime leads when nearing his bonus.[8] (Am. Compl. ¶ 5.C). .

In order to earn a bonus, a Project Consultant had to exceed a certain closing ratio and dollar amount of sales. (Ridley Dep. at 143-44). Ridley complained that on multiple occasions between December 2005 and February 2006, he alerted Merklin that he was nearing his bonus level and desired extra prime leads to reach the requisite closing ratio and sales figures. (Id. at 144). Instead of giving him these higher quality, prime leads, Merklin assigned the prime leads to nonminorities who were nearing their bonus level instead of to Ridley. (Id.). Specifically, Merklin assigned these prime leads to Jeff Wadley, David Broome, Phil Domagalia, and Amber Pereyra. (Id. at 146-49). Ridley admits, however, that he does not know the closing percentages of any of these Project Consultants other than Wadley. (Id. at 149-50). Ridley also admits that Merklin treated other nonminority Project Consultants in the same manner as he was treated. (Id. at 155). Regardless, despite the

---

[8]In his second deposition, Ridley claims that this was not an act of discrimination as alleged in the Amended Complaint, but rather an act of retaliation. (Ridley Dep. II at 168). Because the Amended Complaint alleges that this practice was an act of discrimination, the Court will address it as such. Because of Ridley's characterization of this claim as a retaliation claim in his second deposition, SHIP does not address the merits of the discrimination claim in its motion for summary judgment and instead addressed the claim as if it were a claim for retaliation.

-11-

alleged mistreatment by Merklin Ridley earned his bonus in both December 2005 and January 2006. (Ridley Dep. II at 169). Because Ridley in fact received a sufficient number of leads to earn his bonus for these two months,[9] he has not established that he suffered an adverse employment action in either of these two months. The Court will now proceed to examine Ridley's claim with regards to February 2006.

SHIP argues that Ridley "was assigned the most prime leads in the entire Kitchens Department in . . . February 2006," presumably arguing that Ridley was not discriminated against because he received more prime leads than nonminority Project Consultants. (Doc. 28 at 25). For the month in question, Ridley did in fact receive more total leads and prime leads than any of his nonminority comparators, (Doc. 44 at 5 (noting that Ridley received 36 total leads, with 29 of those being prime leads and that the next highest Project Consultant, Wadley, received 32.5 total leads with 26.5 of those being prime leads)). Accordingly, Ridley has failed to state a prima facie case with regard to Merklin's alleged refusal to provide sufficient prime leads for Ridley to earn a bonus once Ridley alerted him to his nearness to his bonus level because he has not provided evidence that any similarly situated employees were treated more favorably. SHIP is entitled to summary judgment on Count I.

B. Count II—Retaliation

Ridley alleges numerous acts of retaliation in Count II of his Amended Complaint.[10]

---

[9]The record reflects that in both December 2005 and January 2006, Ridley received the highest number of total leads and the second highest number of prime leads amongst his self-identified comparators. (Doc. 44 at 4).

[10]Though the parties' Joint Pretrial Statement admits that Ridley filed a charge with the FCHR on April 10, 2006 alleging racial discrimination and retaliation, (Doc. 38 at 22) the

The Court addresses only Ridley's claim of retaliation regarding the issuance of the May 2006 PPI. Title VII prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]." 42 U.S.C. § 2000e-3(a). In order to establish a prima facie case of retaliation, "a plaintiff must show 'that [he] engaged in . . . statutorily protected expression; (2) [he] suffered an adverse employment action; and (3) there is a causal [connection] between the two events.'" Brochu v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002) (citing Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000)) (alterations in original). "If 'a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant' to produce 'legitimate reasons for the adverse employment action.'" Id. (quoting Johnson, 234 F.3d at 507 n.6). "If the defendant does so, the plaintiff must show that the reasons the defendant gave were pretextual." Id.

SHIP does not argue that Ridley has not presented a prima facie case for retaliation regarding the issuance of the May 2006 PPI. Instead, SHIP asserts that the PPI was issued for a legitimate, nondiscriminatory reason—namely, because Ridley referred a customer to an outside company for the installation of a countertop. When examining whether the given reason is pretextual, a court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit

---

Court notes that the charge is stamped received on April 19, 2006—despite the handwritten date of April 10, 2006 next to Ridley's signature—and alleges a claim of race discrimination only, (see Ex. 18 to Ridley Dep. II).

-13-

a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir.1997) (citation and quotations omitted). This determination involves an "evaluat[ion of] whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.' " Id. (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir.1996)).

Regarding the second PPI, Ridley has presented evidence sufficient to create a genuine issue of material fact regarding whether SHIP's reasons for its actions were a pretext for retaliation. Poole issued the May 2006 PPI on May 22, approximately one week after Merklin submitted his affidavit affirming SHIP's statement to the FCHR regarding Ridley's allegations that Merklin discriminatorily assigned sales leads. The May 2006 PPI states that Ridley violated company policy by referring a customer to a third-party contractor for the installation of countertops. (See May 2006 PPI). However, the conduct warranting this PPI occurred during appointments ranging from September 13, 2005 to January 21, 2006—well before the issuance of the May 2006 PPI. The close temporal proximity between Merklin's affidavit and the May 2006 PPI, when coupled with the fact that the PPI was issued for conduct occurring at a minimum of four months prior to the PPI, is sufficient for a reasonable factfinder to conclude that the proffered legitimate reason was not what actually motivated SHIP's conduct. See Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1293 (11th Cir. 2006). Because Ridley has presented sufficient evidence as to pretext, summary judgment on Count II would be improper.

### C.  Count III—Constructive Discharge

In Count III, Ridley asserts a cause of action for constructive discharge, alleging that "the combination of discriminatory actions against . . . Ridley coupled with the retaliatory actions regarding . . . Ridley caused an environment a reasonable person would find to be conditions under which were intolerable and therefore, his resignation was a constructive discharge." (Doc. 38 at 4).  "Establishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim." Bryant v. Jones, 575 F.3d 1281, 1298 (11th Cir. 2009).  To establish a constructive discharge claim, a plaintiff must show that "a discriminatory employer impose[d] working conditions that [were] 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'" Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974, 977 (11th Cir. 2003) (quoting Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir.1997)).  Ridley cannot meet this high standard as the circumstances that he describes do not rise to the level which a reasonable employee would have found intolerable and felt compelled to resign.  Accordingly, SHIP is entitled to summary judgment on Count III.

### D.  Count IV—Sexual Harassment

In Count IV or the Amended Complaint, Ridley asserts a claim for sexual harassment against SHIP.  Ridley bases this claim upon his allegations that on several occasions, Merklin displayed videos or pictures of various women in the nude and engaging in sexual acts with him.  (Am. Compl. ¶ 25).  Ridley also asserts that Merklin insisted that he watch the videos and made inappropriate remarks such as "you black guys ain't the only ones with big

dicks."[11] (Id.). Ridley alleges that Merklin's actions "were unwelcomed and unwarranted, and were severe and pervasive and constituted sexual harassment." (Id. ¶ 26).

To establish a Title VII hostile work environment sexual harassment claim, an employee must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).  SHIP has moved for summary judgment on this Count, arguing that Ridley has failed to establish a prima facie case for sexual harassment in that he is unable to show that the alleged conduct was "based on sex" or "objectively severe and pervasive."[12]  (Doc. 28 at 18-19).

---

[11]Though the record far from establishes that Merklin insisted that Ridley view the material, the Court accepts Ridley's description as pleaded in the Amended Complaint for the sole purpose of this motion for summary judgment.  Ridley mentioned in his deposition that on at least one occasion he saw Merklin showing something to Poole and another male coworker.  (Ridley Dep. at 182).  Ridley stated that he "was being nosey" as he approached Merklin's desk.  (Id.).  On another occasion, Ridley described Merklin as showing the video to a group of men during a dinner cruise.  (Id. at 180).  Notably, Ridley does not state that Merklin in any way forced Ridley to watch the video.

[12]SHIP also argues that Ridley's claim fails because he did not subjectively view the alleged conduct to be sexual harassment. (See Doc. 28 at 18).  SHIP bases this argument on the affidavit submitted by its psychological expert, Dr. Barbara A. Stein ("Stein"), in which Stein states that Ridley told her that "he did not feel sexually harassed when Mr. Merklin allegedly showed him these pictures."  (Stein Aff. ¶ 4).  Ridley, however, disputes that he ever made this statement.  (Ridley Aff. ¶ 10).  Instead, he claims that he informed Stein he has "emotional issues" from viewing the pictures of his coworkers.  (Id.).  Ridley also claims to have made several other statements to Stein, including the following:
 I stated to her that I have two sisters and forty close female cousins and I have

-16-

In <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75 (1998), the U.S. Supreme Court recognized three scenarios in which a plaintiff could demonstrate that same-sex harassment was based on sex: (1) when there is "credible evidence that the harasser was homosexual;" (2) when a "victim is harassed in such sex-specific and derogatory terms by a [member of the same gender] as to make it clear that the harasser is motivated by general hostility to the presence of [a member of the same-sex gender] in the workplace;" and (3) where there is "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." <u>Id.</u> at 80-81. "Whatever evidentiary route the plaintiff chooses to follow, he . . . must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because of . . . sex.'" <u>Id.</u> at 81 (alteration in original). Thus, to meet the "based on sex" element in a claim for same-sex sexual harassment, Ridley must show that: (1) Merklin sexually desired Ridley; (2) Merklin had a general hostility towards men in the workplace; or (3) Merklin treated males and females differently in the workplace. Because Ridley has not presented any evidence to support a finding of any of these three alternatives, he cannot establish this element and his claim for sexual harassment fails as a matter of law.[13]

---

      always championed equal rights in the workplace. I also stated to Dr. Stein that Mr. Merklin has a daughter and thought he was degrading women and wondered to myself, what if someone was doing this to his daughter. I also stated to Dr. Stein that he was a sexual predator that preys on female employees that he hires at the Florida Sears office in Longwood.

(<u>Id.</u>). Because Ridley disputes that he ever told Stein that he did not feel sexually harassed, a question of fact remains with regard to the subjective element.

    [13]Additionally, the Court finds that the complained-of conduct is not "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily

IV.  Conclusion

In accordance with the foregoing discussion, it is hereby **ORDERED** as followed:

1.  SHIP's Motion for Summary Judgment (Doc. 28) is **GRANTED IN PART** and **DENIED IN PART**.  Summary Judgment is **GRANTED** as to Counts I, III, and IV and **DENIED** as to Count II.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this 25th day of November, 2009.

_____
JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party

---

abusive working environment."